## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 22 2016, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvette M. LaPlante
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Demeko Bradley,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | November 22, 2016<br><br>Court of Appeals Case No.<br>82A01-1602-CR-294<br><br>Appeal from the Vanderburgh Superior Court<br><br>The Honorable Robert J. Pigman, Judge<br><br>Trial Court Cause No.<br>82D03-1412-MR-5429 |

**Brown, Judge.**

[1] Demeko Bradley appeals his conviction and sentence for murder. Bradley raises three issues which we revise and restate as:

  I.   Whether the evidence is sufficient to disprove his claim of self-defense;

  II.  Whether the trial court abused its discretion in admitting photographic evidence; and

  III. Whether his sentence is inappropriate based on the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

[2] Bradley began dating Erin Harvell when she was approximately fourteen years old, and Bradley and Harvell had a child when Harvell was nineteen years old. When Harvell was seventeen or eighteen years old, she started dating Decedric Williams.

[3] At some point after midnight on December 27, 2014, Bradley, Derrick Johnson, and another person arrived at a gas station in Evansville, Indiana, in a blue Tahoe. A short time later, while Bradley was between the driver's side of the Tahoe and the gas pump, Williams, Harvell, and two others arrived at the gas station in a black Cadillac and pulled up on the right side of the Tahoe. Harvell exited the Cadillac, briefly stopped near the front passenger door of the Tahoe, and then walked toward the rear of the Tahoe. Bradley walked around the rear of the Tahoe, and he and Harvell stopped near the rear of the Tahoe and spoke to each other. Williams exited the Cadillac, walked a few steps to the front

passenger door of the Tahoe, and spoke with Johnson. Bradley then moved around Harvell, fired five shots at Williams, and then fled the scene.

[4] Police responded to the shooting and discovered Williams face down in some bushes by a fence. Williams was unresponsive, and police discovered a nine-millimeter firearm underneath him. Williams was transported to the hospital, where he later died. Police took photographs of the crime scene and of Williams's body at the scene and at the hospital. Police discovered ten shell casings at the scene, five of which were .380 and the other five of which were nine-millimeter. Police did not locate the gun used by Bradley, who was later taken into custody in Louisville, Kentucky.

[5] On December 29, 2014, the State charged Bradley with murder. The State later alleged Bradley was an habitual offender. At the trial, the jury heard testimony from, among others, Harvell, Johnson, Bradley, and police investigators, and the court admitted photographs of Williams's body, an autopsy report, and video recordings taken from surveillance cameras at the gas station.

[6] When asked what she and Bradley were discussing when he moved around her, Harvell testified "[n]othing. He just moved around me" and "he just slightly pushed me to the back and I just heard a lot of gunshots." Transcript at 95-96. When asked if she recalled what she told a detective about the manner in which Bradley moved around her, Harvell testified that "I honestly thought he like pushed me out of the way but I see he just kind of shoves me out of the way" and that "[h]e was just trying to push me out of the way," and when asked why

she thought that he moved around her, she answered "[b]ecause I was in front of him." *Id.* at 98. On cross-examination, when asked "didn't [Bradley] also kind of push you behind the Tahoe," Harvell responded affirmatively. *Id.* at 99. When asked "shortly before he made that move to get around you and push you behind the Tahoe, there was kind of a change in his facial expression wasn't there," Harvell answered "[y]es," and when asked "[h]is facial expression changed to one of surprise or fear, didn't it" and "his eyes got a little bigger, correct," she responded affirmatively. *Id.* She further testified that Bradley "kept like looking around me a little bit too. He wasn't like all the way focused on me while I was talking." *Id.* at 100. Harvell further testified that she had observed Williams in possession of a gun earlier that day, that Williams was driving the Cadillac and stopped on Main Street, that someone honked at him, and that Williams pulled his weapon on the person who honked at him. Harvell stated that Williams was out of the Cadillac when he brandished the gun on Main Street, that the vehicle of the person who honked at Williams was a black "Jeep kind of looking car" or "SUV," and that she knew the person, Shayla, who had honked. *Id.* at 104.

[7] On redirect, Harvell indicated that she did not mention Bradley's facial expressions to the police that evening, that she had been drinking a lot that evening, and that she remembered the facial expressions after she thought about what happened that night. When asked if she originally told police that Bradley grabbed her by the neck and threw her to the ground, Harvell replied "[y]eah . . . because that's how I remembered it" but that her testimony was that "he just

kind of shoved me." *Id.* at 116. She indicated that she had talked to Bradley probably more than ten times following the shooting, including two and three days prior to trial. Evansville Police Officer Doug Hamner testified that he was a crime scene investigator and that, when he arrived at the scene and interviewed Harvell, she stated that she was across the street from the gas station when the shooting occurred.

[8]     Johnson testified that, on the night of the shooting, Bradley picked him up in the blue Tahoe and that, while they were stopped on Main Street, there was a "kind of altercation like," which occurred about ten minutes before they arrived at the gas station. *Id.* at 195. He testified "well [Williams] like pointed a gun at the, at the truck" on Main Street at a stoplight. *Id.* at 196. When asked what happened, he said "[t]wo people was – somebody was talking. It was two cars stopped right there," and when asked who was driving those vehicles, he said "not all the way 100 percent sure, I just – you know what I'm saying." *Id.* When asked "[w]ho was there that you know that you can tell us about," Johnson answered "[Williams]. That's all I know for sure." *Id.* When asked if he knew which vehicle Williams was in, Johnson replied "[n]o. He was talking to somebody at the window," and when asked if there were "[t]wo cars other than the Tahoe," he replied affirmatively. *Id.* at 197. He stated the first car at the light was a gray or white Impala and the second vehicle was a truck. When asked if he had "any idea which car [Williams] was likely in," he replied "I would think he was in the first one," and when asked if he was the driver or a passenger, he stated he did not know because Williams was out of the car. *Id.*

at 198.  When asked "[s]o how did it come about that [Williams] is pointing a gun at the truck," Johnson answered "I couldn't even tell you.  You know we were just right there at the light stopped and that's what happened."  *Id.*

[9]     Johnson further testified that, at the gas station, Williams drove up next to the Tahoe, exited the car and started "loudly talking towards" the Tahoe, he had a gun in his right hand, and he "was talking to me and shots got to firing off."  *Id.* at 202.  He testified that Williams was "waving [the gun] around and pointing it" and that "[h]e was coming towards the car on violence."  *Id.* at 204.  When asked what he thought would have happened if Bradley did not shoot at Williams, Johnson answered "[i]t probably went the other way around."  *Id.* at 207.

[10]    On cross-examination, Johnson stated that Williams drove up in a Cadillac at the gas station but was in a gray Impala on Main Street ten minutes earlier.  When asked if Williams had been driving the gray Impala, he replied "I'm thinking."  *Id.* at 211.  He stated that Williams was "[t]alking to the car behind him" and that car was "like a gray truck . . . [l]ike a little SUV Trailblazer."  *Id.* When asked "[d]id you ever see a gun at that point," Johnson answered affirmatively, and when asked "[w]hen," he answered "[w]hen he like noticed that we was behind him.  When he noticed that we was behind the gray Trailblazer."  *Id.* at 213.  When asked "what did [Williams] do after you saw him with a gun," Johnson said "[t]ook off running," and when asked how the Impala moved, he answered that "[s]omebody jumped over there and drove it."  *Id.* at 214-215.  Johnson indicated that at one point after the shooting he went

back to the gas station, and when asked "it appears that you pick up a black object that's on the ground," he replied that it was his cell phone and not a gun. *Id.* at 226.

[11] Bradley testified that, on Main Street, Williams drew a gun and pointed it at the vehicle Bradley was in and then ran away, and that, when the Cadillac pulled up, Harvell exited and started yelling at him. Bradley testified that he fired a weapon at Williams, and when asked what led him to make that decision, he stated that he and Harvell were "arguing back and forth but I'm listening and I heard him and I'm watching him and then I see, see the gun in his hand and he turns" and that Williams was turning the gun towards him. *Id.* at 249. When asked what went through his mind, he testified "[t]hat he was about to shoot. I was scared." *Id.* When asked the length of time from when he saw Williams's gun until he made the decision to fire at him, Bradley replied "[a] few seconds because I'm moving my daughter's mother out of the way and I started shooting." *Id.* at 250. Bradley stated that he was the first one to shoot. He further testified that he began to run and dropped the gun across the street from the gas station, and that he traveled to Louisville several hours later because he was scared. Bradley stated that he thought he was the person Williams was there to hurt and that he thought that, if he had not shot, he would have been dead or shot.

[12] The video from the surveillance cameras at the gas station shows the shooting and the activity at the gas station before and after the shooting. The video shows the Cadillac pull up next to the Tahoe, Harvell exit the Cadillac and

briefly stop near the front passenger side of the Tahoe and then walk toward the rear of the vehicle, Bradley walk around the rear of the Tahoe and stand near Harvell while facing towards the front of the Tahoe, and Williams exit the Cadillac and stand near the front passenger door of the Tahoe speaking to the person seated in the passenger seat. The video shows that, after approximately sixteen seconds, Bradley took about four steps forward around the right side of Harvell, using his left arm to move her slightly to the left, and toward Williams, and while he was moving toward Williams he drew a gun with his right hand and started to fire shots at Williams. After firing his weapon five times, Bradley ran behind the Tahoe and out of view.

[13] The autopsy report states Williams's death "is attributed to exsanguination, secondary to a non-contact gunshot wound of the left abdomen with near transection of the left common iliac artery." Joint Exhibit 1 at 1. The projectile from this wound was recovered from the right side of Williams's abdomen. The report further states that Williams sustained a gunshot wound to his posterior right arm and a gunshot wound to his lateral left buttock. The court admitted photographs of Williams showing in part his wounds. The court instructed the jury regarding self-defense.

[14] In closing argument, Bradley's defense counsel argued that Bradley acted in self-defense and pointed to the video of the shooting and the testimony of Johnson and Bradley. The prosecutor argued Bradley intentionally shot Williams and that he did not act in self-defense. The prosecutor argued there was no factual basis to support a theory of self-defense in this case, asked the

jury to look at the position of Williams in the video at the time Bradley started to shoot, argued Williams was facing and talking to Johnson at the time, and stated the autopsy report is consistent with the video. The prosecutor also discussed the testimony of Harvell and Johnson regarding what occurred on Main Street and at the gas station.

[15] The jury found Bradley guilty of murder, and Bradley admitted to being an habitual offender. The court sentenced Bradley to sixty years for murder and enhanced the sentence by ten years for being an habitual offender.

## *Discussion*

### I.

[16] The first issue is whether the evidence is sufficient to support Bradley's conviction and negate his claim of self-defense. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* The uncorroborated testimony of one witness is sufficient to sustain a conviction. *Ferrell v. State*, 565 N.E.2d 1070, 1072-1073 (Ind. 1991). "Because intent is a mental function and usually must be determined from a person's conduct and resulting reasonable

inferences, the element of intent may properly be inferred from circumstantial evidence." *Beatty v. State*, 567 N.E.2d 1134, 1139 (Ind. 1991).

[17] The offense of murder is governed by Ind. Code § 35-42-1-1, which provides in part that a person who knowingly or intentionally kills another human being commits murder, a felony. Ind. Code § 35-41-2-2 provides that a person "engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so" and that a person "engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

[18] Bradley asserts the State produced no relevant evidence to contradict his claim of self-defense, the video and autopsy report showed only that a homicide took place, and the recording does not show whether Williams verbally provoked Bradley or Bradley was reasonably afraid of Williams. He also argues, without citation to the record, that "[t]he State asked the jury . . . to hold that two pieces of evidence with no probative value or relationship as to any of the elements of self-defense be held to disprove the elements of self-defense *by themselves*." Appellant's Brief at 9. In the facts section of his brief, Bradley also states that Williams had flashed a gun at Bradley earlier on Main Street and that, after Harvell and Bradley had been talking for a short period at the gas station, Bradley's expression changed to one of surprise or fear.

[19] The State maintains that Bradley's arguments are invitations to reweigh the evidence and re-determine the credibility of the witnesses, that there is sufficient

evidence showing Bradley did not act from a fear of great harm or death, and that Johnson's testimony that Williams brandished a gun earlier in the evening was confusing and contradicted by Harvell's testimony. The State also argues that Bradley fled the state within hours of the murder and fired multiple shots at Williams, undercutting his claim of self-defense.

[20] Self-defense is governed by Ind. Code § 35-41-3-2. A valid claim of self-defense is legal justification for an otherwise criminal act. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002). In order to prevail on a self-defense claim, a defendant must demonstrate he was in a place he had a right to be; did not provoke, instigate, or participate willingly in the violence; and had a reasonable fear of death or great bodily harm. *Id.* The amount of force a person may use to protect himself depends on the urgency of the situation. *Harmon v. State*, 849 N.E.2d 726, 730-731 (Ind. Ct. App. 2006). However, "[w]hen a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished. *Id.* at 731.

[21] When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Wilson*, 770 N.E.2d at 800. If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id.* at 800-801. A mutual combatant, whether or not the initial aggressor, must declare an armistice before he or she may claim self-defense. *Id.* at 801. The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of self-defense is

the same as the standard for any sufficiency of the evidence claim. *Id.* We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

[22] The jury was able to view the video from the surveillance cameras at the gas station which depicted the shooting, the position of the Tahoe and Cadillac, and the actions of Bradley, Harvell, and Williams before, during, and after the shooting. The video shows Bradley taking steps forward around Harvell and toward Williams, drawing a gun, and firing multiple times at Williams before running away. The jury could assess the mannerisms and actions of Bradley and Williams immediately prior to the shooting, the extent to which Bradley moved Harvell as he stepped around her, and the relative positions of Bradley and Williams. Additionally, the jury was able to review the autopsy report and the photographic evidence of Williams's body, including the position of the bullet wound to his left abdomen and the wounds to his arm and buttock. Further, the jury heard Harvell's testimony with respect to Bradley's facial expressions prior to the shooting, Johnson's testimony regarding Williams's behavior at the gas station, and the testimony of Harvell, Johnson, and Bradley regarding Williams brandishing a weapon on Main Street prior to arriving at the gas station. The jury was able to consider the extent to which the testimony of each witness was consistent or inconsistent with the testimony of the other witnesses and the other evidence and was able to assess the demeanor and credibility of the witnesses and weigh their testimony. The jury also heard

extensive arguments by the prosecutor and defense counsel regarding the evidence and testimony related to Bradley's claim of self-defense.

[23] Based upon the evidence, the jury could infer that Bradley participated willingly in the violence, that he did not have a reasonable fear of death or great bodily harm, or that the amount of force he used was unreasonable under the circumstances. We conclude based upon the record that the State presented evidence of a probative nature from which a reasonable trier of fact could have determined beyond a reasonable doubt that Bradley did not validly act in self-defense and that he was guilty of murder. *See Wallace v. State*, 725 N.E.2d 837, 840 (Ind. 2000) (affirming the defendant's convictions for murder and attempted murder, noting the defendant claimed that he acted in self-defense and testified one of the victims threatened him with harm if he did not pay money and the other victim reached for him and that at that point he produced a handgun and fired, observing that the trial court gave the jury a self-defense instruction and that the jury nonetheless convicted the defendant of murder, declining to reweigh the evidence, and holding that the State presented sufficient evidence to negate the defendant's claim of self-defense); *Milam v. State*, 719 N.E.2d 1208, 1210-1211 (Ind. 1999) (affirming the defendant's conviction for murder, noting that the defendant and victim had a violent past, the defendant had stated that she shot the victim when he threatened to hit her, the victim was shot four times, and there was no evidence of a struggle, and holding a reasonable trier of fact could have found the defendant did not have a reasonable fear of death or great bodily harm and that the evidence was

sufficient to rebut the defendant's claim of self-defense); *Birdsong v. State*, 685 N.E.2d 42, 45-46 (Ind. 1997) (affirming the defendant's convictions for murder and attempted murder, noting that the victims were the initial aggressors was not dispositive as to whether deadly force was a reasonable response, and holding that the evidence supported the State's argument that the defendant used unreasonable force and did not validly act in self-defense); *Rodriguez v. State*, 714 N.E.2d 667, 670-671 (Ind. Ct. App. 1999) (noting that the defendant's version of events differed from other testimony, declining to reweigh the evidence, and holding that sufficient evidence existed to rebut the defendant's claim of self-defense), *trans. denied*.

## II.

[24] The next issue is whether the trial court abused its discretion in admitting photographic evidence. The court admitted into evidence, over Bradley's objection, a photograph depicting a portion of Williams's body and right arm after he died. Specifically, Evansville Police Officer Ben Gentry testified that he was assigned to the crime scene unit and that he had been asked by Officer Hamner to visit the hospital and photograph Williams after he had passed away in the surgery center of the hospital. Outside the presence of the jury, the State offered State's Exhibit 32, and Officer Gentry testified that the photograph showed a bullet injury to Williams's arm, that Williams was deceased at the time the photograph was taken, that he took approximately ten photographs showing other parts of Williams's body and other wounds, and that the

photograph showed "the table and the medical patches and stuff on his body but that's about it." Transcript at 173.

[25] Bradley's counsel asked "[t]here's also visible in that photograph a substantial amount of blood, is that correct," and the officer replied "[t]hat's correct, yes." *Id.* at 174. Bradley's counsel then objected to the admission of the photograph, stated that Bradley had conceded by stipulation that Williams is deceased, the time of death, the nature of his death, and the cause of his death, and argued that any type of post-mortem photographs were inadmissible and are more prejudicial than probative. The State responded that "[i]t's hardly anything about that photograph that's prejudicial," that the fact the defense stipulated that Williams was dead did not prohibit the State from presenting evidence, that "[t]he wounds are a significant piece in this trial and in this puzzle for the jury and the State ought to have an opportunity to display those wounds to the jury," and that "[t]he State's held back lots of photographs that may have caused alarm. This certainly isn't one of them. It's an arm, Your Honor." *Id.* at 174-175. The court admitted the photograph as State's Exhibit 32. In the presence of the jury, Officer Gentry testified that State's Exhibit 32 was taken after Williams passed away, shows a bullet wound to the upper right arm, and that the medical bandaging on the arm could be seen.

[26] Bradley asserts on appeal that, "[a]fter the defense had stipulated that the victim had been shot, the probative value of photographs of the victim's body depicting the bullet wounds without explanation of how those wounds came to be, did not outweigh their prejudicial value." Appellant's Brief at 9. He

contends that photographic evidence does not need to be particularly gruesome in order to fail the balancing test under Ind. Evidence Rule 403, that the State did not delve into the origin or nature of the wounds, and that the photograph was not relevant to the issue of whether he was acting in self-defense.

[27] The State responds that the photograph in State's Exhibit 32 weighs against Bradley's claim of self-defense because it shows Bradley shot Williams multiple times, that Bradley does not point to precedent which requires a witness through whom a photograph is introduced to describe the origin or angle of bullet holes or whether the defendant acted in self-defense, that the photograph shows a bullet wound to Williams's arm and bandaging, and that the State refrained from introducing other potentially graphic photographs.

[28] The admission of photographic evidence is within the sound discretion of the trial court, and we review the admission of photographic evidence only for abuse of discretion. *Helsley v. State*, 809 N.E.2d 292, 296 (Ind. 2004) (citing *Corbert v. State*, 764 N.E.2d 622, 627 (Ind. 2002)). Photographs, as with all relevant evidence, may be excluded only if their probative value is substantially outweighed by the danger of unfair prejudice. *Id.* (citing Ind. Evidence Rule 403; *Corbert*, 764 N.E.2d at 627). Admission of cumulative evidence alone is insufficient to warrant a new trial. *Id.* An appellant must establish that the probative value of the evidence was outweighed by the unfair prejudice flowing from it. *Id.* The Indiana Supreme Court has stated:

> Relevant evidence, including photographs, may be excluded only
> if its probative value is substantially outweighed by the danger of

unfair prejudice. Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value.

*Corbert*, 764 N.E.2d at 627 (internal citations and quotation marks omitted). A defendant is not entitled to have his actions sanitized when evidence is presented to a jury. *See Reaves v. State*, 586 N.E.2d 847, 859 (Ind. 1992). Evaluating whether an exhibit's probative value is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court. *Helsley*, 809 N.E.2d at 296.

[29] The trial court admitted into evidence approximately twenty-seven photographs introduced by the State, including photographs of Williams, the crime scene, shell casings on the pavement, and bullet holes in the Tahoe. The court admitted into evidence, without objection, three photographs depicting Williams's body which were taken at the scene of the shooting. Officer Hamner testified that he took a number of photographs of the scene, the State moved to admit the photographs, defense counsel stated there was no objection, and the court admitted the photographs. State's Exhibit 21 shows a portion of Williams's abdomen and his right arm while he is on his back on a gurney, State's Exhibit 22 shows Williams's left arm while he is on the gurney, and State's Exhibit 24 shows a portion of Williams's body on the gurney from his waist area to his chest and depicts the bullet wound to his abdomen.

[30]     The photograph to which Bradley objected at trial and appears to challenge on appeal, State's Exhibit 32, shows a portion of the side of Williams's body partially covered by a medical patch or drape, his right arm, and a bullet wound to the arm. Officer Gentry testified he had taken the photograph after Williams had passed away and that he had taken about ten photographs showing other parts of Williams's body and other wounds. The photograph illustrates the testimony related to the gunshot injury to Williams's right arm, and we cannot say the photograph could not have helped the jury understand the testimony and evidence related to the shootings. In addition, while State's Exhibit 32 depicts a medical patch or drape and blood, the photograph is not particularly gruesome. After reviewing the challenged exhibit in light of the other exhibits and all the evidence, we cannot say that the prejudicial impact of the admission of the photograph outweighs its probative value. The trial court did not abuse its discretion in admitting the photograph. *See Helsley*, 809 N.E.2d at 296 (holding that the trial court did not abuse its discretion in admitting several photographs showing gunshot wounds to the victims' heads where the defendant argued the photographs were cumulative and he did not contest that the victims died from gunshot wounds); *Wallace*, 725 N.E.2d at 839 (holding photographs were not particularly gruesome, the probative value of the photographs outweighed any prejudicial impact, and the court did not err by allowing the photographs into evidence).

III.

[31] The next issue is whether Bradley's sentence is inappropriate based on the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[32] Bradley argues he did not have a history of committing violent crimes, he had been threatened with a gun by the victim earlier in the evening, Williams pulled up next to him with a weapon, and Bradley responded by shooting at the victim, but only after moving Harvell out of the way. He argues that the nature of the crime and his character do not indicate that justice requires that he serve a sentence above the advisory range.

[33] The State responds that Bradley senselessly shot Williams five times and fled the state within a couple of hours, Bradley and Williams knew each other and both dated Harvell, Bradley did not receive the maximum sentence, and that he has a criminal history including numerous prior felony convictions.

[34] A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five (65) years, with the advisory sentence being fifty-five (55) years. Ind. Code § 35-50-2-3. The trial court sentenced Bradley to sixty years and ordered that his sentence be enhanced by ten years for being an habitual offender.

[35] With respect to the nature of the offense, the record reveals that Bradley stepped toward Williams and shot him five times, resulting in Williams's death, and then traveled to Louisville. With respect to the character of the offender, the presentence investigation report ("PSI") indicates that as a juvenile Bradley was adjudicated delinquent for an act that would constitute theft as a class D felony if committed by an adult in 2001 and an act that would constitute burglary as a class B felony if committed by an adult in 2003. His adult criminal history consists of possession of cocaine or a narcotic drug as a class B felony in 2004, false informing as a class B misdemeanor in 2005, and dealing in a narcotic drug as a class A felony in 2009. The PSI further indicates that Bradley was a participant in the court's re-entry program when he committed the instant offense and that the results of the Indiana risk assessment show that he is a very high risk to reoffend.

[36] After due consideration, we conclude Bradley has not met his burden of establishing that his aggregate sentence is inappropriate in light of the nature of the offense and his character.

### *Conclusion*

[37] For the foregoing reasons, we affirm Bradley's conviction and sentence for murder.

[38] Affirmed.

Robb, J., and Mathias, J., concur.